| | | |
|---|---|---|
| CHERYL MONROE, | | |
| | Plaintiff, | DECISION AND ORDER |
| -vs- | | |
| XEROX CORPORATION, | | 07-CV-6085 CJS |
| | Defendant. | |

## APPEARANCES

For Plaintiff:  Christina A. Agola, Esq.
730 First Federal Plaza
28 East Main Street
Rochester, NY 14614
(585) 262-3320

For Defendant:  Margaret A. Clemens, Esq.
Trent M. Sutton, Esq.
NIXON PEABODY LLP
1100 Clinton Square
Rochester, NY 14604

## INTRODUCTION

**Siragusa, J.** This is an action pursuant to Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law ("NYHRL") in which plaintiff Cheryl Monroe ("Monroe") contends that defendant Xerox Corporation ("Xerox") discriminated against her in retaliation for engaging in protected activity. Now before the Court is Xerox's motion for summary judgment (Docket No. 20). For the following reasons, the motion is granted.

**BACKGROUND**

The following factual background is based primarily on the parties' submissions pursuant to Western District of New York Local Rule of Civil Procedure 56.1. Except were otherwise indicated, the parties are in agreement on these facts. As required by law, the Court views the facts in the light most favorable to the non-moving party, Monroe.

Monroe began working for Xerox in 1977 and was promoted through the ranks from an assembler to her current position as Electrician A (the highest level electrician in the company). In addition, Monroe is a member of Local 14A Rochester Regional Board Xerographic Division UNITEHERE![1] ("the Union") and a collective bargaining agreement ("CBA") governs her terms of employment with Xerox.

The CBA contains provisions controlling the distribution of overtime work and requires Xerox to use reasonable efforts to "distribute overtime as equally as is practicable among employees of the same job classifications within each area as long as job knowledge and/or job continuity are not involved." (Dillard Aff., Ex. A, at MON102.) Supervisors typically assign available overtime work to the employee with the fewest hours of overtime, but the CBA permits a supervisor to make exceptions where assigning the person with the lowest time would be "impracticable" or "unreasonable," such as where job knowledge and job continuity, or both, are involved. During the course of a year, employees will differ in the amount of overtime hours worked, and Xerox's obligation is to balance overtime by the end of the calendar year. However, a difference of 100 hours of overtime between employees is

---

[1] UNITE (formerly the Union of Needletrades, Industrial and Textile Employees) and HERE (Hotel Employees and Restaurant Employees International Union) merged on July 8, 2004 forming UNITE HERE. "What is UNITE HERE?", *available at* http://www.uniteunion.org/about/ (last checked May 11, 2009).

not considered unbalanced.

Per the terms of the CBA, both Xerox and the Union keep track of the distribution of overtime hours, and employees can check their overtime hours through the year. Also, the CBA provides that disagreements about overtime are to be resolved through the grievance process. Further, employees in Monroe County, New York, are governed by the "Monroe County Rules of Conduct." (Dillard Aff., PARA 17.) The Monroe County Rules of conduct prohibit, *inter alia*, the use of harassing and abusive language to supervisors, otherwise known as Rule 15.[2] If an employee violates Rule 15, a supervisor can issue that employee a B Labor Report, or higher (such as C, D, or E), depending on the offense. B Labor Reports remain in an employee's personnel file for eighteen months, and then are expunged, unless another Labor Report is issued during that eighteen-month period. The receipt of three C Labor Reports in a twenty-four month period is a ground for discharge.

Monroe filed her first grievance against Alice Dillard ("Dillard"), a Xerox Maintenance Supervisor, and Monroe's direct supervisor, on September 27, 2005. In her grievance, Monroe complained that Dillard was denying her overtime.[3] This grievance, as well as other ones Monroe filed, were handled through the grievance procedure provided for in the CBA.

On January 23, 2006, nearly four months after filing her grievance, Monroe was issued a C Labor Report. The parties' accounts of the basis for the C Labor Report differ somewhat. Xerox maintains that on January 19, 2006, Monroe placed a call to Dillard on a two-way radio and requested permission to perform preventative maintenance on overtime. Monroe agrees, but states that in addition, she inquired as to why she was not scheduled

---

[2] "15. Harassment, intimidation, creating an undue disturbance or using abusive language to supervisors or other personnel." (Dillard Aff., Ex. I.)
[3] Monroe points out that the September 27, 2005, grievance was not resolved in September 2005.

for the weekend to do preventative maintenance ("PM"). in that regard, Monroe states that she told Dillard that failure to assign her PM would constitute a willful violation of OSHA[4] regulations.

According to Monroe, Dillard responded that PM would only be done by outside contractors, to which Monroe responded, "that's ludicrous." (Monroe Dep., at 42:3.) Monroe describes Dillard as "very hotty" and alleges that she, Monroe, then explained the importance of PM to Dillard and then said to Dillard, "You know perhaps—if you don't understand the fundamental responsibilities of maintenance, perhaps you shouldn't be a supervisor." (Monroe Dep., at 42:5.) Monroe further maintains that, in a later exchange, Dillard called her back and continued the argument, after which Monroe said to Dillard, "You know what, you just don't give a shit about this operation" and "Whatever." (Monroe Dep., at 42:13.) The C Labor Report was later reduced to a B Labor Report, and, since Monroe received no further disciplinary reports within eighteen months, was expunged. Xerox and Monroe agree that males who engaged in conduct, similar to the conduct in which Xerox alleges she engaged also received disciplinary Labor Reports for violating Rule 15. However, Monroe contends that none of those males was supervised by Dillard.

Xerox's records show that overtime hours for employees in Monroe's job classification and work group were balanced by the end of each year and that, "[i]n fact, [Monroe] had six more hours of overtime compared to the other male electrician, Ed Brown, in 2006 and an hour more in 2007." (Dillard Aff. ¶ 9.)

---

4   Monroe does not explain the acronym OSHA, but in this context, the Court presumes it is a reference to the the United States Department of Labor Occupational Safety and Health Administration. *See* 29 C.F.R. Part 24, *et seq*.

Subsequently, an August 29, 2006, letter of reprimand was issued to Monroe based on her conduct in a meeting on August 22, 2006, during which Monroe said words to the effect that Dillard lied to "cover [her] ass." Monroe explained at her pretrial deposition as follows:

> We were in a grievance meeting. As before, I presented Information that would dispute what she [Dillard] said and prove that what she said was untrue. And I indicated that they were—they were "misinformation," I used the word. At the end of [sic] I used the word "lie." I said, "Because you've lied," I said, "I expect now that I get paid in a check rather than compensatory because you have lied and you've been untruthful to me. There is no reason for this." So that's all that happened. There was [sic] no raised voices. There was no profanity. There was—I did not call her a liar. I did not use crude language. At one point during the meeting, she asked me why I thought she would lie. I said to her, "To cover your ass." And that's what they considered crude language, I guess.

(Monroe Dep., at 83:10-25, 84:2.)

On October 17, 2006, Earl Pringle and Fred Garrett, both fellow workers at Xerox, informed Monroe that they had heard Dillard using profanity loudly on the shop floor. Monroe testified at her pretrial deposition that she was not present to hear the alleged profanity Dillard used, but she nonetheless made that profanity the subject of one of her grievances, even though the profanity Dillard used was not directed to or about Monroe.

On October 19, 2006, Monroe filed a grievance against Dillard for taking photographs on the shop floor of two practical jokes that Monroe created (one involving a photograph of a dog, and the other involving lines of tape on the floor). (Monroe Dep., at 86-90.) Monroe testified that she was not present when Dillard allegedly took the photographs. Xerox took no action against Monroe or Dillard.

Monroe's employment with Xerox has not been terminated and she has not been demoted. Moreover, she has not received any decreases in her rate of pay as a result of any of her complaints of discrimination.

## STANDARDS OF LAW

*Rule 56*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in ad-

missible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### *Title VII and the NYHRL*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State*

*Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999) (citations omitted), *abrogated on other grounds, Kessler v. Westchester County Dept. of Social Servs.*, 461 F.3d 199 (2d Cir. 2006). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the NYHRL.

### *Retaliation*

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted). Making a complaint regarding harassment to one's supervisor is "protected activity" under Title VII. *Id*.

Retaliation claims are analyzed using the three-tier burden-shifting test "set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny." *Valentine v. Standard & Poors*, 50 F. Supp. 2d 262, 281-82 (S.D.N.Y. 1999) (citations and internal quotations omitted), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Under the first tier of the *McDonnell Douglas* test,

the plaintiff must establish a prima facie case.[5] If the plaintiff establishes a prima facie case,

> the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge [or other adverse employment action]. At this stage, the employer need only articulate—but need not prove—the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity. Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason…is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F. Supp. 2d at 281-82 (Citations and internal quotations omitted); *see also, Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003).

At the third tier of the McDonnell Douglas test, simply proving that the employer's proffered reason was false may, or may not, establish the required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct." In other words, "it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 146-47 (2000) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519 (1993). In this regard,

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explana-

---

[5] It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion as the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation and internal quotation marks omitted).

tion is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves*, 530 U.S. at 148-49.

## ANALYSIS

### *Monroe Engaged in Protected Activity as of May 17, 2006*

It is settled principle that a "plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII" in order to constitute protected activity. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *see also Wimmer v. Suffolk Co. Police Dept.*, 176 F.3d 125, 134 (2d Cir. 1999) (citation omitted); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation omitted). Rather, "the plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Manoharan*, 842 F.2d at 593 (citations omitted). Here, Xerox argues as follows:

> In this case, it is undisputed that, although plaintiff filed ten grievances between September 2005 and January 2007, only the January 2007 grievance protested or even mention discrimination based upon gender or any other protected category. (Clemens Aff., Ex. 8, 10-11, 13-17). Accordingly, only the January 2007 grievance can be used meet plaintiff's *prime facie* burden of demonstrating that she engaged in a protected activity as a matter of law. See *Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 524-25 (S.D.N.Y. 1998). But, since plaintiff alleges no retaliatory incident occurring after her January 2007 complaint, reliance on this complaint is unavailing.

(Xerox Mem. of Law, at 10.) Monroe responds that, "Specifically, Plaintiff engaged in protected activity as early as September 27, 2005 when she filed a grievance indicating that she was not afforded the appropriate amount of overtime." (Monroe Mem. of Law, at 6.) Further, she states that,

> Defendant argues, and correctly so, that any incident occurring prior to September 27, 2005 cannot as a matter of law be considered retaliation for having engaged in protected activity. However, defendant's arguments that only Plaintiffs January 2007 grievance can constitute protected activity for which unlawful retaliation can occur is misguided. As stated above, Plaintiff engaged not only in the grievance process, but also made internal and external complaints regarding being treated differently based upon her gender. (56.1 Counter Statement ¶¶ 3-5; 61-64; 65-92; 96-118). It is undisputed, at the very least, that Plaintiff complained to defendant's Ethics Hotline as well as filing 3 separate EEOC charges about being discriminated and retaliated against. It is beyond cavil that defendant would argue that any retaliatory actions on defendant's behalf are only legal sufficient if they occurred after January of 2007.

(*Id.*) The Court will review the internal and external complaints to determine whether they meet the criteria of complaining about discrimination covered by Title VII.

Beginning with the October 2005 grievance, Monroe claims that she complained about the discrepancy of 359 hours between two male electricians and herself and refers to vol. I, Ex. A., p. 36, lines 16-18. (Monroe Counter Statement ¶61.) That reference is to Monroe's pretrial deposition, the pertinent portion of which is as follows:

> Q. Let me ask you for the time period, the three-year period you worked for Alice Dillard. Did you believe that she treated you differently because of your gender?
>
> A. Yes.
>
> Q. Okay. And tell me what facts are you relying on to support your belief in that regard?
>
> A. 2005 there was a 359 hour disparity, discrepancy between the two other electricians, male and myself. And I went to her before all those hours approved, I told her, "There is something wrong here. Let's straighten it out." Each time she came back with some excuse, a different excuse and told me there was nothing w[r]ong. So I filed the grievance.…
>
> Q. Do you remember what you said to her and what she said to you?
>
> A. I said, "there is a problem with these hours. We need to rectify it." And she said, "Well, I'll look into it." She looked into it and came back to me and said

there was nothing wrong.

(Monroe Dep., at 36:9-23, 37:17-23.) The grievance to which Monroe referred is attached as Exhibit K to her supporting papers, and is dated "8/8 – 9/26/05." In that grievance, Monroe complained that "[a]s of the week ending 10/2/05, the overtime accumulation report reflects a discrepancy of 359 hrs. between the highest and lowest electrician." (Ex. K., at 1.) She further alleges in the grievance that the company is negligent in upholding the CBA. She specifically mentions Ed Brown and Steve Hedden and lists their overtime hours. (*Id.*, at 2-3.) Nowhere in the grievance, nor in her actual complaint to Alice Dillard did Monroe speak about discrimination based upon her gender. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) ("a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII...."). Therefore, the October 2005 grievance does not support her claim that she engaged in protected activity.

The next incident Monroe mentions in her Counter Statement is the one that occurred on or about January 19, 2006. (Monroe Counter Statement ¶ 65.) The particulars of this incident are related above, and involve an allegation that Monroe was in violation of Rule 15 by being insubordinate to her supervisor, Dillard. As a result, Monroe was suspended for three days as a result. During the meeting at which Monroe was suspended by Joe Calabria ("Calabria"), a supervisor at Xerox, Monroe related the following:

> I said, "If this was a man, there would be—this would—this would not be happening at all. Because you use profanity, you yell, you lose your temper," I said, "She loses her temper, swears," I said, "Every male on that floor swears and loses their temper." I said, "That is the environment in which we live and you know it." That was it. They took my badge. Subsequently, I filed a grievance on him for harassment.

(Monroe Dep., at 44:4-13.) The basis for Monroe's C Labor Report was not that she used profanity, but that she was insubordinate to her supervisor. Monroe's subsequent grievance, dated January 23, 2006,[6] complained about Xerox's issuance of a C Labor Report because of her insubordination, and is attached to Monroe's papers as Exhibit N. In her grievance, Monroe claimed that she had not violated Rule 15. (Ex. N, at 1.) Monroe stated at her deposition that as a result of her grievance, the C Labor Report was reduced to a B Labor Report, and she was paid for the days she had been suspended. (Monroe Dep., at 44:22-45:2.) The subject of the C Labor Report, later reduced to a B Labor Report, was insubordination, not discrimination. Neither Monroe's initial act (of insubordination) or Xerox's response (issuance of a C Labor Report, subsequently reduced to a B Labor Report, and thereafter expunged), pertains to discrimination prohibited by Title VII. At oral argument, Monroe suggested that the C Labor report was only issued because she complained that male workers used profanity without consequences at the January 20, 2006. meeting with Dillard and Calabria. She argues that her complaint about men's use of profanity was protected activity and that the C Labor report was issued in retaliation. However, this argument was not raised in Monroe's papers. In her written submissions, she claimed that the protected activity involved her filing of a grievance, complaints to the Ethics Hotline and filing of a complaint with the EEOC. (Pl.'s Mem. of Law at 6-7.) "[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion." *In re Monster Worldwide, Inc. Securities Litigation*, 251 F.R.D. 132, 137-38 (S.D.N.Y. 2008); *accord Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006).

---

[6] On April 5, 2006, Monroe called Xerox's Ethics Hotline and made a complaint about "[t]he discrimination…[r]egarding suspension, regarding overtime." (Monroe Dep., at 67:2-7.)

Moreover, Monroe has failed to present any evidentiary proof in admissible form that other males violated Rule 15, but were not disciplined. *See Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997) ("To establish the fourth element of a *prima facie* case, [a plaintiff] must show that she was treated differently from 'similarly situated' males.… To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects."); *Bennett v. Verizon Wireless*, No. 04-CV-6314-CJS, 2008 U.S. Dist. LEXIS 5373, *15-16 (W.D.N.Y. Jan. 24, 2008) (dismissing claim where plaintiff failed to show employees were similarly situated). The January 2006 incident does not support Monroe's claim that she was engaged in protected activity, or that she was treated differently from similarly situated males. Thus, it does not support her contention that she was engaged in protected activity.

Monroe made further complaints under the CBA: on July 24, 2006 (an overtime balancing disagreement involving 18 hours, of which she ended up winning eight hours) (Monroe Dep., at 79:2-15); on August 28 and 29, 2006 (a complaint that Dillard failed to call her in early to earn overtime to fix a machine, which amounted to four hours of overtime, as well as a complaint that she received a letter of reprimand for calling Dillard a liar) (Monroe Dep., at 80:3-84:8); on October 17, 2006 (a complaint that another employee reported that he heard Dillard use profanity on the shop floor) (Monroe Dep., at 84:13-85:12); on October 19, 2006 (a complaint about Dillard taking pictures on the shop floor) (Monroe Dep., at 85:14-91:4); and on January 18, 2007 (a complaint about not being called in for overtime for four hours) (Monroe Dep., at 91:6-93:3). Other than the January 18, 2007, grievance, the substance of the remaining grievances did not touch on discrimination due to sex, and thus, do not support Monroe's contention that she was engaged in protected activity. How-

ever, she filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC") on May 17, 2006, September 8, 2006 and October 11, 2006. In these filings, she complained to the EEOC that she was being subjected to a continuing pattern of unlawful retaliation in violation of Title VII and New York law. Consequently, only as of May 17, 2006, did Monroe engage in protected activity.

***Monroe Did Not Suffer an Adverse Employment Action***

Xerox disputes that Monroe suffered an adverse employment action because it issued her a C Labor Report in January 2006, or a subsequent letter of reprimand August 2006. It is well settled that,

> in order to support a claim of retaliation a plaintiff must demonstrate the "employer's challenged action would have been material to a reasonable employee," which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005); *see, e.g., Manning*, 127 F.3d [686] at 692 [(8th Cir. 1997), *overruled in part by Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 60 (2006)] ("not everything that makes an employee unhappy is an actionable adverse action"); *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997) (dictum noting "there is room for a *de minimis* threshold" in claims of retaliatory conduct). And this is so regardless whether the alleged retaliatory act is related to the plaintiff's employment.

*Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). As the Supreme Court clarified in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006), "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."

As of May 17, 2006, Monroe engaged in protected activity. Monroe alleges that she was "subject to continuous write-ups and harassment by her supervisor Dillard, which she did not subject other male employees to the same type of conduct," (Compl. ¶ 13) and that

"she was subject to a hostile environment[7] based on sex and retaliation from her supervisor after she complained. Plaintiff was wrongfully disciplined and denied overtime [in] retaliation for her complaints of her supervisor['s] conduct" (Compl. ¶ 35). As the Supreme Court observed in *Burlington*:

> The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms.… It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers.…And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

*Burlington*, 548 U.S. at 68 (citations omitted). Viewing the evidence in the light most favorable to the non-moving party, the Court determines that Dillard's actions following the date of the EEOC complaint were insufficiently likely to deter a reasonable employee from unfettered access to Title VII's remedial mechanisms. *See, e.g., Cody v. County of* Nassau, 577 F. Supp. 2D 623, 646-46 (E.D.N.Y. 2008) (falsely accusing plaintiff of being absent without authorization, threatening plaintiff with future counseling notices and disciplinary actions, writing plaintiff up for leaving work early, placing plaintiff on a Medical Review List, which required documentation from her physician whenever she utilized a sick day, issuing plaintiff a counseling notice while she was on FMLA leave in September 2001, which pertained to three separate incidents that occurred prior to her FMLA leave, and engaging in a pattern of conduct against plaintiff which sought to create a hostile work environment, which includes altercations between plaintiff and her supervisor do not constitute adverse employment actions for purposes of a retaliation claim.); *see also Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) ("Indeed, 'not everything that makes an employee unhappy is an actionable ad-

---

[7] Despite alluding to a hostile work environment, Monroe's complaint lists her two causes of action as retaliation under federal and state law.

verse action.' *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir.2001).").

Monroe was a union member. An antagonistic relationship between union members and management is not unusual. *See, e.g., Becher v. Long Island Lighting Co.*, 164 F.R.D. 144, 153 (E.D.N.Y. 1996) ("the Court is mindful of the adversarial relationship between labor and management which serves as the basis for collective bargaining").[8] The Union comments on Monroe's grievances show that they supported her, and that the relationship between the Union and Xerox was adversarial, at best. Thereafter, the Court determines that Monroe has failed to show that because Dillard wrote her up for infractions and was generally antagonistic towards her, that Monroe was subjected to adverse employment actions.

Monroe also argues that the August 29, 2006, letter of reprimand (for calling Dillard a liar), as well as the C Labor Report (subsequently reduced to a B Labor Report and expunged) will subject her to increasingly severe discipline. (Monroe Mem. of Law, at 11.) The record, though, before the Court on this motion does not support Monroe's argument. No evidence shows that she has received any increased discipline since August 29, 2006, two years and five months prior to Xerox's filing of its motion for summary judgment.

***Even if Monroe Suffered Adverse Employment Actions, No Causal Connection Exists***

Monroe began complaining about disparities in overtime on September 27, 2005. However, as the Court has determined, the September 2005 complaint was not a protected activity. Even if it was, the first alleged adverse employment action by Xerox took place almost four months later on January 23, 2006, when Monroe was issued a C Labor Report.

---

[8] *See also*, Jeannie Reitz (Union) letter to Alejandro Cordova (Xerox) (Feb. 20, 2007) (commenting that Dillard's taking pictures on the shop floor was "an undue disturbance caused by the management team and it is understandable why the group feels that it was offensive to them."

Temporal proximity alone is insufficient to carry a plaintiff's burden of proof beyond the *prima facie* stage, *Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008) ("temporal proximity alone is insufficient to establish pretext"), and nothing Monroe has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her discipline. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1180 (10th Cir.1999) ("Assuming the time between Plaintiff's termination and filing her EEOC claim is sufficient to survive summary judgment in regard to establishing a *prima facie* case, it cannot overcome Defendant's proffered reason for terminating her. The evidence overwhelmingly supports Defendant's proffered reason and Plaintiff presents nothing which would cause a reasonable finder of fact to determine that the reason is unworthy of belief."). Moreover, as already discussed above, the September 2005 complaint had nothing to do with sex discrimination or any other discrimination protected by Title VII. It was not until May 2007 that Monroe first made a complaint that referred to sex discrimination (there is insufficient evidentiary proof in admissible form of the contents of the April 2007 Hotline call to determine that it involved a complaint of sex discrimination).

Monroe has offered nothing more than temporal proximity to support her argument that Xerox retaliated against her. She argues in her memorandum of law, at 14, that the Court should measure the time not from her initial grievance on September 27, 2005, but from the date that grievance was resolved in November 2005. She contends that, "there was not more than three months between Plaintiff's initial overtime grievance and her Labor Report as defendant contends." Monroe fails, however, to meet her burden to make out a *prima facie* case. First, she has not shown that she engaged in protected activity in September 2005, and likewise, that she engaged in protected activity in October or Novem-

ber 2005. Thus, even if the September 2005 grievance involved sex discrimination and was not resolved until November 28, 2005, the time difference is still 56 days, almost two months. In that regard, Monroe also offers no reason why Xerox's alleged retaliatory act, on January 23, 2006, should be viewed in proximity to Xerox's November 28, 2005, settlement of Monroe's overtime grievance.

Even if there was a sufficient temporal proximity, which there is not, Monroe offers nothing to show that Xerox disciplined her *because of* her protected activity. Further, Xerox has come forward with evidentiary proof that other employees, who are male and who had not filed complaints of discrimination, were disciplined for violating Rule 15 and issued suspensions for longer periods of time than was Monroe. (*See, e.g.,* Xerox Labor Report (Oct. 10, 2005), attached as Ex. 19 to Clement Aff. (showing the issuance of an E Labor Report to a male employee for shouting and cursing at a female employee); Xerox Labor Report (Jul. 8, 2005) (showing the issuance of a C Labor Report with three day suspension to a male employee who was insubordinate to a female supervisor); Xerox Labor Report (May 25, 2007) (showing the issuance of a D Labor Report to a male employee, along with a two week suspension and final warning letter, for being uncooperative and yelling and screaming at two female employees).

Monroe has failed to make a *prima facie* case that she engaged in a protected activity prior to her EEOC complaints, or that she suffered an adverse employment action following her EEOC complaints, or that her employer's January 2006 disciplinary action was done in retaliation for Monroe's having filed grievances, or that the August 29, 2006, letter of reprimand was issued because of retaliation. Monroe has failed to, "present evidence sufficient to support a jury verdict in [her] favor." *Anderson*, 477 U.S. at 249, or to raise a

material issue of fact. Xerox has shown that it is entitled to judgment.

**CONCLUSION**

For the foregoing reasons, Xerox's motion (# 20) for summary judgment is granted.

The Clerk is directed to enter judgment for Defendant and close the case.

SO ORDERED.

Dated: October 14, 2009
Rochester, New York

ENTER.

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge